### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DMITRY LAZAREV, an individual, | |
| Plaintiff, | |
| v. | No. |
| AMERICAN MEDICAL TECHNOLOGIES, INC, an Illinois corporation, AMERIMED HOLDINGS INC., an Illinois corporation and JEFFERY MICHAEL DRIZIN, an individual, | PLAINTIFF DEMANDS TRIAL BY JURY |
| Defendants. | |

### COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

As and for his Complaint for Declaratory Relief and Damages against American Medical Technologies, Inc. ("AMT"), AmeriMed Holdings Inc. ("AmeriMed" and, collectively with AMT, the "Companies") and Jeffery Michael Drizin ("Drizin" and, collectively with the Companies, "Defendants"), Plaintiff Dmitry Lazarev ("Lazarev") alleges as follows:

### NATURE OF THE ACTION

1.     This is an action arising from intentionally false and misleading statements made by Drizin to induce Lazarev to agree to deposit $1,170,000 of his personal funds into the United States so that Drizin could seek to obtain leverage over Lazarev's business interests abroad, reap a windfall for himself and preserve his reputation and business interests domestically.  Until August 2016, Lazarev was led to believe—based upon the written and oral representations by Drizin—that his transactions with Drizin and AMT (a company operated out of Drizin's residence and one in which Drizin was the majority shareholder and CEO) were simply a means to facilitate Lazarev's 99% ownership in a new investment vehicle (AmeriMed) in the United States.  Lazarev's ownership and control over AmeriMed was critically important to Lazarev and

was the driving force behind Lazarev's decision to fund a substantial amount of money into the United States.

2. Drizin knew that ownership and control were critically important for Lazarev and also knew that Lazarev would rely on Drizin to ensure his goals were accomplished. Notwithstanding his knowledge of Lazarev's reliance, Drizin surreptitiously took several actions to thwart Lazarev's ability to control any of these investments. Drizin was able to achieve this fraudulent scheme based upon the history of the parties' relationship, the great deal of trust and confidence Lazarev reposed in Drizin and because Drizin, unlike Lazarev, spoke fluent English and was domiciled in the United States.

3. Drizin took unfair advantage of this deeply rooted trust and confidence for his personal economic gain by, among other things: (i) encouraging Lazarev to purchase stock in a company Drizin controlled (AMT) in order to fund Lazarev's majority ownership in the to-be-formed investment vehicle (AmeriMed); (ii) encouraging Lazarev to deposit a $500,000 check into a bank account that, unbeknownst to Lazarev (and notwithstanding contra evidence provided to the bank) was owned and controlled by Drizin; (iii) representing to Lazarev (and third parties) the appearance of full ownership and control over assets owned by AmeriMed (including a lavish condominium in Naples, Florida) yet documenting the transactions and opening bank accounts that assured Drizin would maintain actual control; (iv) causing the Companies that he controlled to convert and misuse Lazarev's funds for his personal benefit; (v) entering into financial commitments and lease arrangements on behalf of the Companies that contain terms detrimental to Lazarev; and (vi) repeatedly assuring Lazarev that he need not review or concern himself with corporate documents and financial statements because Lazarev should focus on running the businesses in Russia and allow Drizin to focus on all matters in the United States.

CHICAGO/#2965461

4.     The foregoing conduct substantially impaired, and continues to impair, Lazarev's ability to control and monitor his interests in AmeriMed, and to receive the financial and other benefits to which a vast majority shareholder is entitled.  Lazarev discovered the fraud in August 2016 when Drizin blocked access to Lazarev's assets and, thereafter, ceased communication with Lazarev following a dispute concerning Lazarev's Russian businesses.  Recently, Lazarev also learned that, without Lazarev's knowledge or consent, Drizin is attempting to sell the condominium that Lazarev purchased in Naples, Florida.  Drizin has also informed Lazarev that Drizin styles himself as the sole shareholder of AmeriMed and that Lazarev is not a shareholder of either of the Companies despite his $1,170,000 investment.

5.     Lazarev brings this action to obtain:  (i) a declaratory judgment in his favor that he is a 99% shareholder in AmeriMed, (ii) a declaratory judgment in his favor that he is a shareholder of AMT, (iii) damages for the oppressive and unlawful conduct of Drizin, President and CEO of the Companies, and purported controlling/majority shareholder in AMT, in violation of Drizin's fiduciary duties to the Companies' other shareholders, including Lazarev; and (iv) a full and complete accounting of the Companies' books and records of account (e.g., revenues, profits, dividends, compensation, benefits and expenses).

## PARTIES

6.     Lazarev is a citizen of the Russian Federation where he also conducts business (including business in the medical services industry).  Lazarev has been (and remains) a shareholder of each of the Companies since August 2014, having investing $1,170,000 collectively.  Lazarev is neither fluent nor conversant in English.

7.     AMT is an Illinois corporation headquartered and doing business in Lake County, Illinois.  AMT is in the business of exporting medical equipment.  Lazarev is a shareholder in AMT, and Drizin is the President and Chief Executive Officer of the company.

8.     AmeriMed is an Illinois corporation headquartered and doing business in Lake County, Illinois. AmeriMed is an investment company with certain holdings. Presently, upon information and belief, these holdings include: (i) residential property located at 17 Bluebill Avenue, #103, Naples, FL 34108 (the "Naples Condo"); (ii) garage space #5 at the building where the Naples Condo is located (the "Garage Space"), and (iii) a 2015 Toyota Camry (the "Toyota Camry," and, collectively with the Naples Condo and Garage Space, the "AmeriMed Assets"). Lazarev is the rightful controlling shareholder in AmeriMed, and Drizin is the President and Chief Executive Officer of the company.

9.     Drizin is a citizen of the State of Illinois who resides and conducts business in Lake County, Illinois. At all times relevant, Drizin has been the President and CEO of the Companies. Upon information and belief, and at least as of September 19, 2016, Drizin purports to be the majority shareholder of AMT. Moreover, as a result of his deception, Drizin contends that he is the sole shareholder of AmeriMed. Drizin is fluent in both English and Russian.

## JURISDICTION AND VENUE

10.     The jurisdiction of this Court is based upon diversity pursuant to 28 U.S.C. § 1332, in that the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), in that Defendants are residents of this State and reside within this judicial district. Venue is also proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial portion of the events giving rise to Lazarev's claims arose in this district and division.

CHICAGO/#2965461

## FACTS

### LAZAREV IS APPROACHED BY DRIZIN

12.     Lazarev first met Drizin in 2005, when Drizin purposed to use the exporting business of AMT's medical equipment to partner with certain of Lazarev's business interests in Russia.  These discussions resulted in Drizin (through AMT) providing medical equipment to Lazarev's Russian businesses in the healthcare industry (collectively, the "Russian Business").

13.     Based on the success of the Russian Business, the relationship between Lazarev and Drizin flourished for many years.

14.     In or around 2014, Drizin encouraged Lazarev to invest money in the United States.  Drizin also encouraged Lazarev to use a portion of these funds to purchase property in Florida and to facilitate his children's secondary education in the United States.

15.     Drizin's overtures made sense to Lazarev.  Indeed, rather than constrain his two children to travel home to Krasnoyarsk, Russia during school breaks several times a year, Lazarev agreed to purchase the Naples Condo (as well as the Toyota Camry and Garage Space) to provide a residence in the United States for his children to stay during breaks from school.  Moreover, the purchase of the Naples Condo enabled Lazarev to travel with his entire family to the United States, visit his sons and securely stay in vacation property owned by him.  For Lazarev, this was a "dream" come true and, until recently, it appeared to Lazarev that Drizin was resolved to fulfill those dreams.

16.     Based on their deep relationship and the trust and confidence he held in Drizin, Lazarev followed Drizin's recommendations and agreed to invest substantial personal funds in the United States.  Lazarev was principally interested in having the flexibility and control of the investments which his $1,170,00 would fund, including his status as a 99% shareholder of AmeriMed, the to-be-formed investment vehicle, and all of the protections rightfully provided by

such a majority ownership interest. Lazarev relied entirely upon Drizin to advise Lazarev on the prudent and legal means of transferring funds to accomplish the investment. Lazarev's reliance upon Drizin was justifiable and reasonable based upon, among other things, Lazarev's relationship with Drizin, Lazarev's knowledge of Drizin's business experience in Russia and the United States (including Drizin's expertise as an exporter of medical supplies from the United States into Russia) and Drizin's representations and other written and oral assurances.

17.     At all relevant times, Drizin knew of Lazarev's intentions as to how Lazarev wanted his funds utilized. Against this backdrop, Drizin represented that the most prudent and legal means by which Lazarev could accomplish his goals would be for Drizin to incorporate an investment company in the United States that would be controlled by Lazarev. To that end, Drizin represented that, because Lazarev is a foreign citizen, Lazarev could not own 100% of an American business. As such, Drizin represented that, upon receipt of Lazarev's funds, Lazarev would be a 99% shareholder in AmeriMed (the newly formed entity), with Drizin owning the remaining 1% in the company. Drizin further represented that Lazarev would have the power to direct and control AmeriMed's investments, as well as a means through which Lazarev could flexibly fund his children's education and expenses in the United States while he remained in Russia.

18.     At no time was it apparent to Lazarev that, in reality, Drizin was covertly biding his time and taking actions to gain leverage over Lazarev in the event that the Russian Business may face complications. In that circumstance (as later proved true), Drizin cut off all communications with Lazarev and held all of Lazarev's investments hostage unless and until Lazarev acquiesced to Drizin's demands regarding the future of the Russian Business.

CHICAGO/#2965461

*LAZAREV INVESTS $1,170,000 TO BECOME (OR SO HE WAS LED TO BELIEVE) A 99% OWNER OF AN INVESTMENT VEHICLE BASED IN THE UNITED STATES*

19.     To facilitate the transactions, and based upon Drizin's representations and assurances, Lazarev initially purchased 870 shares of AMT stock for $870,000.  Lazarev purchased AMT's stock because Drizin represented that Lazarev was prohibited from purchasing any stock in AmeriMed at the time (as, according to Drizin, AmeriMed had yet to be formed). Lazarev directly funded the $870,000 from his personal bank account in the Russian Federation to AMT's Chase Bank account in Chicago, Illinois, as follows:

- $50,000 transferred to AMT on or about August 7, 2014 for the purchase of 50 shares of AMT stock;

- $200,000 transferred to AMT on or about October 30, 2014 for the purchase of 200 shares of AMT stock;

- $167,000 transferred to AMT on or about February 12, 2015 for the purchase of 167 shares of AMT stock;

- $80,000 transferred to AMT on or about February 15, 2015 for the purchase of 80 shares of AMT stock;

- $73,000 transferred to AMT on or about April 2, 2015 for the purchase of 73 shares of AMT stock; and

- $300,000 transferred to AMT on or about August 19, 2015 for the purchase of 300 shares of AMT stock;

20.     Lazarev's purchase of AMT stock and ownership of AMT is further memorialized in, among other things, various AMT board minutes and certain stock purchase agreements entered between AMT (through Drizin) and Lazarev, including, at least:  (i) an August 3, 2014 Corporation Stock Sale and Purchase Agreement; (ii) an August 5, 2014 Stock Purchase Agreement; (iii) an October 31, 2014 Stock Purchase Agreement; (iv) a February 2, 2015 Stock Purchase Agreement; (v) an August 26, 2015 Stock Purchase Agreement and (vi) a February 12,

CHICAGO/#2965461

2016 Stock Purchase Agreement (collectively, the "AMT Stock Purchase Agreements," true and correct copies of which are attached hereto and incorporated herein as **Group Exhibit 1**.).

21. Notwithstanding AMT's obligations set forth in the AMT Stock Purchase Agreements and applicable law, Lazarev never received stock certificates in AMT. Lazarev also never received notice of a single shareholder meeting and never received any dividends or tax documents from AMT.

22. In addition, unbeknownst to Lazarev and contrary to Drizin's earlier written and oral representations, Drizin incorporated AmeriMed on or about August 22, 2014. Drizin named himself as agent and President, and named the other shareholder of AMT (his wife, Elena Klimenkova) as Secretary. Drizin also formed AmeriMed with the same principal place of business as that of AMT.

23. After Lazarev transferred the above-referenced $870,000 to AMT for the purchase of 870 shares of AMT stock, Lazarev travelled to the United States to meet with Drizin. They first met in Chicago. During this time, on or about August 26, 2015, Drizin executed a check to Lazarev drawn from the same Chase Bank account held in AMT's name (the "AMT Check," a true and correct redacted copy of which is attached hereto and incorporated herein as **Exhibit 2**). Notably, the AMT Check was in the amount of $500,000 for the express purpose of "500 Shares buy back" as Drizin and AMT represented on the AMT Check itself. Accordingly, as of August 26, 2015, Lazarev retained 370 shares of AMT stock.

24. Contemporaneously with his receipt of the AMT Check, Drizin instructed Lazarev to deposit those funds into AmeriMed's bank account at Chase Bank (the "AmeriMed Account"). At the time, Drizin again represented to Lazarev that Lazarev was the 99% owner of AmeriMed and that such ownership provided Lazarev with control of the company. At the time,

CHICAGO/#2965461

Lazarev believed that he had full control over all assets then held (or that would be held) under AmeriMed's name. Drizin documented these representations in writing and advised Lazarev that, for all intents and purposes, Lazarev was AmeriMed.

25.     Based upon Drizin's representations and warranties, Lazarev and Drizin went together to a branch of Chase Bank in Deerfield, Illinois to deposit the AMT Check into the AmeriMed Account. Critically, so that the bank would accept the AMT Check as a deposit by Lazarev into the AmeriMed Account, Drizin prepared documents memorializing Lazarev's status as a majority owner of AmeriMed, which documents Drizin then provided to the bank representative (Igor Rivkind). Drizin represented to Lazarev (and the Bank) that the document was true and correct and reflected Lazarev's majority ownership in AmeriMed. Upon receipt of this evidence, the bank accepted Lazarev's deposit of the AMT Funds into the AmeriMed Account. Drizin never provided a copy of this document to Lazarev.

26.     Notwithstanding these representations, as Lazarev later learned, Lazarev had no control over the AmeriMed Account and no signing authority (which was, instead, controlled entirely by Drizin). Moreover, when the relationship soured in the fall of 2016, Drizin took the position that Lazarev was never an owner of AmeriMed. Until the fall of 2016, Lazarev was unaware of Drizin's secret activities, and Lazarev's relationship with Drizin continued as it had in the past, which further strengthened the trust and confidence Lazarev had in Drizin.

### PURCHASE OF ASSETS BY AMERIMED & LAZAREV

27.     After Lazarev deposited the AMT Check, Lazarev and Drizin flew to Naples, Florida together to inspect potential investment opportunities in residential properties, as Lazarev desired to purchase a residence in the area for his sons to reside during school breaks. During this trip, Lazarev decided to purchase the Naples Condo. Lazarev negotiated the purchase price on the Naples Condo. To that end, Lazarev and his representatives (including Andrey Lazarev

-9-

("Andrey"), his son and power of attorney in the United States) worked with real estate agent Richard Collette to cause AmeriMed to close on the Naples Condo (which closing occurred on or about October 1, 2015).

28.     In or around early 2016, and at Lazarev's direction, Drizin caused AmeriMed to purchase the Garage Space in the same building as the Naples Condo for a total of $75,000.

29.     At all relevant times during the trip to Naples and the purchase and closing of the Naples Condo and the Garage Space, Drizin held out Lazarev (including to third parties) as the owner of AmeriMed with full power and authority to cause AmeriMed to purchase the Naples Condo and Garage Space.  Lazarev believed this to be true and did not know that, in fact, Drizin purported to be the sole shareholder of AmeriMed.  Indeed, based on discussions between and among Lazarev, Andrey and these third parties (including Richard Collette), Lazarev advised that he had no intention of renting out the Naples Condo and expressed his desire to inspect additional residential properties for investment opportunities.  Moreover, Drizin periodically updated Lazarev on the bills and expenses owed in connection with the Naples Condo (which Lazarev also funded entirely through his payments to AMT and AmeriMed).

30.     At or around the same time, and at Lazarev's direction, Drizin caused AmeriMed to purchase the Toyota Camry for, among other things: (i) Lazarev's use while staying at the Naples Condo; (ii) AmeriMed business; and (iii) for use by Andrey.

31.     Thereafter, in December 2015 and during a subsequent trip to Naples, Lazarev purchased nearly $20,000 in personal property (including clothes, furniture, electronic devices and other furnishings) for use in the Naples Condo (collectively, the "Condo Personal Property").  The Condo Personal Property was purchased directly by Lazarev using his own personal funds while he was in Naples as evidenced by, among other things, invoices between

CHICAGO/#2965461

the manufacturers and Lazarev. After Lazarev purchased the Condo Personal Property, the Condo Personal Property was used to furnish the Naples Condo. Upon information and belief, the Condo Personal Property remains in the Naples Condo to this day.

32.     Lazarev and his family stayed in the Naples Condo without issue (including a trip between December 2015 and March 2016). Lazarev had full use of the Naples Condo at his discretion and stayed in the Naples Condo without advance notice to Drizin. Upon information and belief, Drizin owned other residential property in the Naples, Florida area and would agree, if requested by Lazarev, to drive Lazarev and his family from the airport to the Naples Condo.

33.     In addition to the Naples Condo, and at Lazarev's instruction, Drizin caused AmeriMed to fund a semester of tuition for Lazarev's son (Andrey) at Bentley University in Massachusetts. In or around July 2016, AmeriMed sent a wire transfer in the amount of $30,538.

34.     To further facilitate Andrey's collegiate studies (including his personal expenses), Lazarev directed Drizin to cause AmeriMed to provide Andrey with a debit card. Drizin did, in fact, cause AmeriMed to provide a debit card for Andrey on the AmeriMed Account. Lazarev's son used the debit card without issue until August 2016, as set forth in greater detail below.

35.     Accordingly, Lazarev had no cause to believe that his investments were in jeopardy or that Drizin was taking actions to thwart Lazarev's control over those investments.

### LAZAREV'S FINAL $300,000 INVESTMENT AND SUBSEQUENT DISCOVERY OF DRIZIN'S SCHEME

36.     On or about February 18, 2016, Lazarev invested another $300,000 from his personal bank account in the Russian Federation to AMT's Chase Bank account for the purchase of another 300 shares of AMT stock (the "2016 AMT Investment" and, collectively with the previous purchase of 370 shares of AMT Stock, the "Lazarev AMT Investment"). Drizin made several written and oral representations that the Lazarev AMT Investments would be used by Drizin and AMT to make several other investments.

-11-

37.     The parties met again in Florida on March 23, 2016.  Until this meeting, upon information and belief, Lazarev's funds were the only source of funding for AmeriMed and neither Drizin nor AMT contributed any amounts to AmeriMed.

38.     During the Florida meeting, and as set forth in the March 24, 2016 Memorandum of Understanding between AMT (through Drizin) and Lazarev (the "2016 MOU"), Drizin and Lazarev further memorialized the parties' agreements whereby Lazarev would purchase AMT stock to facilitate his investment in AmeriMed.  The 2016 MOU also documented their agreement to pledge additional funds to AmeriMed related to the potential sale of the Russian Business.

39.     In the ensuing months, the owners of the Russian Business collectively agreed not to sell the Russian Business and Lazarev did not pledge any additional funds to AmeriMed.

40.     However, Lazarev continued to communicate with Drizin in an effort to gain additional clarity about the investments purportedly made by Drizin with the Lazarev AMT Investments.  On August 24, 2016, Drizin sent an e-mail to Lazarev wherein he advised that "[f]rom [Drizin's] approval," "IPI Wealth Management, Inc." "made the first investment [and] bought 2 stocks" for $50,000.  Six days later, on August 30, 2016, Drizin sent another e-mail to Lazarev opaquely indicating that Lazarev held $350,000 in "investments."

41.     At or around the same time (August 2016), Andrey traveled to Chicago, Illinois to meet with Drizin.  During this meeting, Drizin advised Andrey that Drizin caused AmeriMed to: (i) terminate Andrey's access to the AmeriMed Account; and, instead, (ii) open a new account with AmeriMed at Chase Bank, which was funded with approximately $3,000 (the "AmeriMed Personal Account").

42. Drizin also retained administrative (and signing) authority over the AmeriMed Personal Account. Drizin did not seek Lazarev's approval before taking these actions, and did not seek Lazarev's consent to do so. If Drizin had, Lazarev would have refused such actions.

43. In response to Drizin's unilateral actions with respect to Andrey's access to the AmeriMed bank accounts, Lazarev e-mailed Drizin asking for an explanation, requested the return of the 2016 AMT Investment and requested additional documents to confirm the veracity of Drizin's earlier written and oral representations regarding Lazarev's 99% ownership in AmeriMed. In response to Lazarev's e-mail, Drizin refused to return the 2016 AMT Investment, advised that he (Drizin) was, in fact, the sole shareholder of AmeriMed and, under that pretext, refused to provide any additional AmeriMed documents to Lazarev. Drizin also took immediate steps to block Andrey's access to the AmeriMed Personal Account and withdrew all remaining funds therefrom.

44. In September 2016, Lazarev received a copy of the minutes of a September 12, 2016 board meeting of AMT (the "AMT Board Minutes", a true and correct copy of which is attached hereto and incorporated herein as **Exhibit 3**). Prior to September 2016, Lazarev was not advised of any such board meeting, and did not otherwise know of or participate in the same. The AMT Board Minutes purport to reflect a single matter discussed—namely, the nomination of Drizin as President and CEO of AMT, which matter allegedly received 100% approval by AMT's then-acting board of directors. The AMT Board Minutes also purport to reflect Drizin as owning 55% of AMT's stock.

45. At or around the same time, Lazarev also received a copy of purported by-laws of AMT dated May 6, 2015 (the "AMT By-Laws," a true and correct copy of which is attached hereto and incorporated herein as **Exhibit 4**). Notably, the AMT By-Laws reflect—contrary to

-13-

Drizin's representations, the AMT Stock Purchase Agreements and the fact that Lazarev purchased at least 870 shares of AMT Stock—that the then-acting sole shareholders of AMT were Drizin and his wife, Elena Klimenkova. This was the first time Lazarev received the AMT By-Laws or reviewed documents that suggested that he was not, in fact, a shareholder of AMT.

46.     On or about November 5, 2016, Drizin sent an e-mail to Lazarev stating that: "I hereby inform you that apartment No. 103 in Naples, Florida, has been rented out for the winter and you cannot rent it this year." A true and correct copy of this Nov. 5, 2016 e-mail (translated into English) is attached hereto and incorporated herein as **Exhibit 5.**

47.     This unilateral action by Drizin, without authority or consent by Lazarev, alarmed and substantially damaged Lazarev. Not only did such action indicate further aggressive tactics by Drizin, but it substantially impacted Lazarev's planned trip to the Naples Condo that following month (of which Drizin knew and used as leverage).

48.     Once again, Lazarev was not consulted and would never have approved of Drizin's renting the Naples Condo to a third party. Moreover, Lazarev's intent on purchasing the Naples Condo was not only to make the real estate investment, but also to provide his sons a place to live during periodic breaks from their studies in the United States.

49.     Consequently, on or about November 13, 2016, Lazarev again e-mailed Drizin expressing his concern over Drizin's unauthorized actions and demanded an immediate response. A true and correct copy of this Nov. 13, 2016 e-mail (translated into English) is attached hereto and incorporated herein as **Exhibit 6**. As set forth in the e-mail, Lazarev disputed the right of Drizin or AmeriMed to take such actions against Lazarev's interests based upon, among other things, Lazarev's majority ownership in AmeriMed and the agreements between Lazarev and

Drizin regarding the same. Lazarev also demanded to know whether Drizin sold, or otherwise disposed of, the Condo Personal Property.

50. Drizin ignored Lazarev's e-mail.

51. Receiving no response, Lazarev sent a subsequent e-mail to Drizin, wherein Lazarev reiterated the parties' intent that, as a 99% shareholder of AmeriMed, he would have full control over AmeriMed's investments, profits and assets (including use of the Naples Condo). A true and correct copy of this December 21, 2016 e-mail (translated into English) is attached hereto and incorporated herein as **Exhibit** 7. Lazarev's communication with Drizin also documented the fact that the Naples Condo, Garage Space and Toyota Camry were all paid for entirely by Lazarev's funds. Lazarev concluded this e-mail with another demand for a response from Drizin and, failing that, an acknowledgment that Lazarev would be left with no alternative but to engage counsel and commence litigation.

52. On February 15, 2017, after receiving no response from Drizin, Lazarev (through counsel) requested a formal inspection of the Companies' books and records, as is his right as a shareholder of the Companies (the "Inspection Demand"). Additionally, the Inspection Demand sought access for Lazarev to inspect and utilize the AmeriMed Assets during his family's visit to the United States during the upcoming month of March. A true and correct copy of the Inspection Demand, and the e-mail attaching the Inspection Demand, is attached hereto and incorporated herein as **Exhibit 8**.

53. Drizin did not respond to the Inspection Demand.

54. After Lazarev's counsel issued the Inspection Demand, Lazarev discovered that the Naples Condo and Garage Space were listed for sale, including on the public "multiple listing service" ("MLS"). At no time did Lazarev approve of the potential sale by AmeriMed of the

-15-

Naples Condo and Garage Space. If consulted, Lazarev would have refused to permit AmeriMed to sell the Naples Condo and Garage Space.

55. However, Lazarev was never consulted or advised by anyone (including Drizin) of Drizin's intention to sell the Naples Condo and Garage Space and list the same on the MLS. Moreover, upon review of the listing on the MLS, it appears that several pieces of the Condo Personal Property are still in the Naples Condo and, apparently, also slated to be sold to the highest bidder.

56. Upon discovering the MLS listing of the Naples Condo and Garage Space, Andrey e-mailed Drizin to request an opportunity to collect certain of the Condo Personal Property. On March 6, 2017, Drizin responded with an e-mail acknowledging that Andrey could come to Naples and pick up the Condo Personal Property. In response, Andrey sent another e-mail requesting details on scheduling his access to the storage room so that he could pick up the Condo Personal Property. Drizin did not respond to the request.

57. Accordingly, Lazarev is left with no choice but to commence litigation to remedy Drizin's misconduct.

## COUNT I—DECLARATORY JUDGMENT
### (Against Drizin and AmeriMed)

58. Lazarev incorporates paragraphs 1 through 57 above.

59. Lazarev performed all conditions precedent required of him and not otherwise waived by Drizin and AmeriMed.

60. Section 2-701 of the Illinois Code of Civil Procedure (735 ILCS 5/2-701) permits, in the cases of actual controversy, a court to make binding declarations of rights of interested parties, having the force of a final judgment, whether or not any consequential relief is or could be claimed.

-16-

61.     An actual and justiciable controversy that is not advisory, moot or premature currently exists between Lazarev, on the one hand, and Drizin and AmeriMed, on the other hand, with regard to Lazarev's 99% ownership of AmeriMed.

62.     Lazarev contends that he owns 99% of AmeriMed in accordance with the parties' agreements and Drizin's representations.

63.     Drizin contends that he owns 100% of AmeriMed.

64.     An immediate and definitive determination of Lazarev's 99% ownership in AmeriMed is necessary to resolve the controversy and, thereby, clarify and settle the legal relations between the parties and afford relief from the uncertainty that has arisen from the controversy.

65.     Lazarev has a tangible legal interest in the prompt resolution of the controversy because Drizin and AmeriMed refuse to acknowledge Lazarev's 99% ownership in AmeriMed, which precludes Lazarev from taking action on behalf of AmeriMed himself (including, but not limited to, stopping the potential sale of the Naples Condo and Garage Space).

## COUNT II—DECLARATORY JUDGMENT
### (Against Drizin and AMT)

66.     Lazarev incorporates paragraphs 1 through 57 above.

67.     Lazarev performed all conditions precedent required of him and not otherwise waived by Drizin and AMT.

68.     Section 2-701 of the Illinois Code of Civil Procedure (735 ILCS 5/2-701) permits, in the cases of actual controversy, a court to make binding declarations of rights of interested parties, having the force of a final judgment, whether or not any consequential relief is or could be claimed.

-17-

69.     An actual and justiciable controversy that is not advisory, moot or premature currently exists between Lazarev, on the one hand, and Drizin and AMT, on the other hand, with regard to Lazarev's ownership of AMT.

70.     Lazarev contends that he owns shares of AMT stock reflected in the Lazarev AMT Investments in accordance with the parties' agreements and Drizin's representations.

71.     Drizin contends that Lazarev does not own any stock in AMT.

72.     An immediate and definitive determination of Lazarev's ownership in AMT is necessary to resolve the controversy and, thereby, clarify and settle the legal relations between the parties and afford relief from the uncertainty that has arisen from the controversy.

73.     Lazarev has a tangible legal interest in the prompt resolution of the controversy because Drizin and AMT refuse to acknowledge Lazarev's ownership in AMT, which precludes Lazarev from taking action certain actions and receiving certain benefits to and from AMT (including, but not limited to, participating in shareholder meetings, controlling his investments, and receiving dividends).

## COUNT III—BREACH OF FIDUCIARY DUTY
### (Against Drizin)

74.     Lazarev incorporates paragraphs 1 through 57 above.

75.     As the controlling/majority shareholder of closely held Illinois corporations, Drizin owes Lazarev fiduciary duties as a matter of law.  Moreover, as a director and officer of the Companies, Drizin owed Lazarev fiduciary duties, including among others:  a duty to act at all times with the utmost honestly, good faith, loyalty and fair dealing towards Lazarev; a duty to at all times avoid self-dealing and acting for his own personal gain to the detriment of Lazarev and the Companies; and a duty to act in the best interest of Lazarev in all matters relating to, at least, AmeriMed.

CHICAGO/#2965461

76.     Lazarev reposed trust and confidence in Drizin that he would abide by his fiduciary duties.

77.     Drizin breached his fiduciary duties in at least the following ways:

(A)     engaging in acts of shareholder oppression including, without limitation, using his position as an officer and the controlling/majority shareholder of the Companies to: (i) deprive Lazarev of the full value of his equity interests in the Companies; (ii) use the Companies' finances to unjustly enrich himself; and (iii) interfere with Lazarev's rights under the AMT Stock Purchase Agreements between AMT and Lazarev;

(B)     approving, for himself, upon information and belief, excessive annual compensation and other benefits, while failing to declare any dividends to AMT's shareholders, including Lazarev;

(C)     encouraging Lazarev to deposit the AMT Check into the AmeriMed Account that, unbeknownst to Lazarev (and notwithstanding contra evidence provided to the Bank) was owned and controlled by Drizin;

(D)     preparing the AMT Stock Purchase Agreements and other agreements and documents to include terms and provisions that grossly and unfairly favor Drizin and substantially limit Lazarev's ability to (i) run AmeriMed of which he is the majority owner and (ii) obtain rights as a shareholder of AMT;

(E)     misappropriating money belonging to Lazarev by incurring expenses and purchasing investments without Lazarev's consent or approval;

(F)     failing to advise Lazarev that the AMT By-Laws should be amended prior to Lazarev acquiring an interest in AMT (or thereafter);

(G)     renting the Naples Condo and Garage Space to a third party without Lazarev's consent or approval;

(H)     listing the Naples Condo and Garage Space for sale without Lazarev's consent or approval; and

(I)     failing to provide access to financial records of the Companies.

78.     Drizin's conduct in breaching his fiduciary duties to Lazarev, as enumerated above, was purposefully intended and designed to divert money, resources and other benefits from Lazarev and AmeriMed, an entity in which Drizin owns a 1% interest, to various other entities in which Drizin owns an interest greater than 1% (including, but not limited to, AMT).

79.     The breaches of fiduciary duties by Drizin have proximately caused Lazarev to suffer substantial harm, including but not limited to depletion and loss of Lazarev's finances and capital, and loss of control and imposition of grossly unfair terms and provisions that inhibit Lazarev's ability, as majority owner, to control and operate AmeriMed and its assets (including, but not limited to, the Naples Condo, the Garage Space and the Toyota Camry).

80.     Drizin's surreptitious conduct in breaching his fiduciary duties to Lazarev was knowing, intentional and of such an aggravated character as to warrant imposition of punitive damages against Drizin.

81.     It is difficult at this time, without an accounting, to ascertain the amount of proceeds that Drizin has wrongfully realized by reason of his breaches of fiduciary duties and, therefore, to ascertain the exact amount of damages suffered by Lazarev.

## COUNT IV – CONVERSION
### (Against Drizin)

82.     Lazarev incorporates paragraphs 1 through 57 above.

83.     Drizin, as an officer and director of the Companies, had access to the Companies' finances and capital, and was fully authorized to independently sign checks, withdraw funds, make payments (including compensation and profit distributions), and otherwise approve payments on behalf of the Companies.  Drizin also was fully authorized to negotiate and enter into financial commitments on behalf of the Companies.

84.     Taking advantage of and acting beyond the scope of authority to which he was entrusted by Lazarev, and acting in his own self-interest, Drizin also wrongfully exercised dominion and control, and purposefully misdirected and diverted money from Lazarev, AMT and AmeriMed, without informing Lazarev and in breach of the parties' agreements and understandings regarding the distribution of capital, compensation and profits.

-20-

85.     In diverting money from the Companies to himself, Drizin wrongfully exercised and assumed control over the Companies' property to which the Companies were entitled at all times and to which the Companies have the exclusive and sole right to immediate possession.

86.     The conversion of Lazarev's, AMT's and AmeriMed's property by Drizin has proximately caused Lazarev, AMT and AmeriMed to suffer substantial harm, including but not limited to the depletion and loss of Lazarev's, AMT's and AmeriMed's finances and capital.

87.     Drizin's surreptitious conduct in converting Lazarev's, AMT's and AmeriMed's property was knowing, intentional and of such an aggravated character as to warrant imposition of punitive damages against Drizin.

88.     Lazarev has either (i) made a demand upon Drizin that he return all money and property wrongfully converted by him, and Drizin has refused to remit the same and/or (ii) not made a demand for all such money and property because such demand would be futile.

89.     It is difficult at this time, without an accounting, to ascertain the amount of proceeds that Drizin has wrongfully converted from Lazarev, AMT and AmeriMed and, therefore, to ascertain the exact amount of damages suffered by Lazarev, AMT and AmeriMed.

### COUNT V – FRAUD
**(Against Drizin)**

90.     Lazarev incorporates paragraphs 1 through 57 above.

91.     Taking advantage of the trust and confidence that Lazarev reposed in Drizin, and acting in his own self-interest and that of AMT, as well as taking advantage of and acting beyond the scope of authority to which he was entrusted by Lazarev, Drizin engaged in the following fraudulent conduct to the detriment of Lazarev:

> (A)     engaging in acts of shareholder oppression including, without limitation, using his position as an officer and the controlling/majority shareholder of the Companies to:  (i) deprive Lazarev of the full value of his equity interests in the Companies; (ii) use the Companies' finances to unjustly

enrich himself; and (iii) interfere with Lazarev's rights under the AMT Stock Purchase Agreements between AMT and Lazarev, all to the detriment of Lazarev without informing Lazarev, and falsely representing to Lazarev that Lazarev would be the 99% owner in AmeriMed with full control over AmeriMed's assets; and

(B)     preparing the AMT Stock Purchase Agreements and other agreements and documents to include terms and provisions that grossly and unfairly favor Drizin and substantially limit Lazarev's ability to (i) run AmeriMed of which he is the majority owner and (ii) obtain rights as a shareholder of AMT, all to the detriment of Lazarev without informing Lazarev, and falsely representing to Lazarev that such terms and provisions are standard and boilerplate;

(C)     falsely representing to Lazarev that Lazarev should purchase stocks in AMT because AmeriMed was not yet incorporated;

(D)     falsely representing to Lazarev that Lazarev cannot own 100% of an American company;

(E)     encouraging Lazarev to deposit the AMT Check into the AmeriMed Account that, unbeknownst to Lazarev (and notwithstanding contra evidence provided to the bank) was owned and controlled by Drizin;

(F)     misappropriating money belonging to Lazarev by incurring expenses and purchasing investments without Lazarev's consent or approval;

(G)     renting the Naples Condo and Garage Space to a third party without Lazarev's consent or approval;

(H)     listing the Naples Condo and Garage Space for sale without Lazarev's consent or approval;

(I)     failing to advise Lazarev that the AMT By-Laws should be amended prior to Lazarev acquiring an interest in AMT (or thereafter);

(J)     preparing incorporating and other operative documents of the Companies to include terms and provisions that grossly and unfairly favor Drizin, and substantially limit Lazarev's ability to run the Companies, including AmeriMed of which he is the majority owner without informing Lazarev of such implications; and

(K)     opening and operating bank accounts of the Companies (including the AmeriMed Account) with full control without informing Lazarev, so that Drizin could convert and steal money belonging to Lazarev by inducing Lazarev to contribute substantial funds to AMT and/or Drizin.

-22-

92.    Despite having knowledge to the contrary, Drizin misrepresented to Lazarev—by inducing Lazarev into providing $1,170,000 in funds to Drizin—that the management of Lazarev's funds would be controlled by Lazarev, and that there were no improprieties or comingling of financial assets by proceeding with the transactions, agreements and funding as detailed above.

93.    Drizin likewise engaged in self-concealing activities and did not disclose that he was surreptitiously incorporating AmeriMed, opening the AmeriMed Account to which he only had access and control, and taking other steps to ensure that Lazarev would have no control over either of the Companies.

94.    Similarly, Drizin engaged in self-concealing activities by usurping Lazarev's effective ownership of the Naples Condo and Garage Space and misappropriating hundreds of thousands of dollars Lazarev intended to be invested in assets located in the United States.

95.    At no time was Drizin authorized by Lazarev to take such actions.

96.    Drizin's actions were intended to conceal the foregoing improprieties and calculated to deceive Lazarev.

97.    Lazarev trusted and relied upon Drizin's representations.

98.    Lazarev reasonably and justifiably relied upon Drizin to advise him regarding the terms and conditions of all agreements and undertakings to be performed in order for Lazarev to invest $1,170,000 of funds in the United States for the purposes described herein.

99.    Drizin concealed from and failed to explain or advise Lazarev that the provisions in the above-mentioned agreements gave considerable control and economic advantage to Drizin disproportionate to his Drizin's own ownership interests, to the detriment of Lazarev as the majority owner of AmeriMed and owner of AMT.

100.     Drizin's actions were intended to fraudulently conceal these and other improprieties and calculated to deceive Lazarev despite the fact that Drizin was obligated to protect the interests of Lazarev without self-dealing, conflicts of interest or taking any action to the detriment of Lazarev.

101.     Drizin had a personal financial motive and incentive to engage in the foregoing fraudulent conduct, which conduct has proximately caused Lazarev to suffer substantial harm, including but not limited to:

(A)     Depletion and loss of Lazarev's finances and capital;

(B)     Loss of profit distributions to which Lazarev is entitled; and

(C)     Loss of control and imposition of grossly unfair terms and provisions that inhibit Lazarev's ability, as majority owner, to control and operate AmeriMed.

102.     It is difficult at this time, without an accounting, to ascertain the amount of proceeds that Drizin has defrauded from Lazarev and, therefore, to ascertain the exact amount of damages suffered by Lazarev.

## COUNT VI – ACCOUNTING
### (Against Drizin, AMT and AmeriMed)

103.     Lazarev incorporates paragraphs 1 through 57 above.

104.     Equity permits a court to award an accounting where a party has no adequate legal remedy and some special and substantial ground of equity jurisdiction exists, such as fraud, the need of a discovery, the mutuality or complexity of accounts, or the existence of a fiduciary relationship.

105.     As a shareholder of the Companies, Lazarev has the legal right to inspect the books and records of the Companies. Despite this right, and Lazarev's request to exercise it, the

CHICAGO/#2965461

Companies and Drizin improperly refused Lazarev's access to the Companies' books and records.

106.    Further, as the controlling/majority shareholder of closely held Illinois corporations, Drizin owes Lazarev fiduciary duties as a matter of law.  Drizin breached those fiduciary duties by, among other things, engaging in acts of shareholder oppression.

107.    The Companies' books and records, including records of account, are large and complex.

108.    Lazarev does not have an adequate remedy at law.

109.    Under these circumstances, an accounting of the Companies' books and records of account (e.g., revenues, profits, dividends, compensation, benefits and expenses) is equitable, necessary and proper.

<u>COUNT VII – VIOLATION OF 805 ILCS 5/12.56(a)</u>
**(Against Drizin, AMT and AmeriMed)**

110.    Lazarev incorporates paragraphs 1 through 57 above.

111.    Drizin's pattern of conduct to ignore, reduce, diminish or otherwise modify Lazarev's interests at AMT is illegal, oppressive, and fraudulent as to Lazarev in Lazarev's capacity as a shareholder of AMT for purposes of the Illinois Business Corporation Act, 805 ILCS 5/1 *et seq.* (the "<u>Corporation Act</u>") and, specifically, 805 ILCS 5/12.56(a)(3).

112.    Additionally, Drizin's pattern of conduct to ignore, reduce, diminish or otherwise modify Lazarev's interests and authority at AmeriMed is illegal, oppressive and fraudulent as to Lazarev in Lazarev's capacity as a shareholder of AmeriMed for purposes of 805 ILCS 5/12.56(a)(3).

113.    Drizin's pattern of conduct has included the misapplication and wasting of assets of both AMT and AmeriMed for purposes of 805 ILCS 5/12.56(a)(4).

-25-

114.    AmeriMed has suffered significant financial injury as a result of the conduct of Drizin, who controls AMT and purportedly controls AmeriMed, and further irreparable injury to the Companies is threatened by the conduct of Drizin, including insolvency.

115.    The business of AMT and AmeriMed can no longer be conducted to the general advantage of all shareholders, because Drizin has exercised his position of purported control to the detriment of the position of Lazarev – as a shareholder in AMT and as a majority shareholder in AmeriMed.

116.    Drizin has oppressed Lazarev and  engaged in illegal and fraudulent conduct as to Lazarev, as detailed above.

117.    As a result of Drizin's oppressive, illegal and fraudulent conduct, Lazarev is entitled to seek statutory remedies pursuant to 805 ILCS 5/12.56(b):

(1)    The performance, prohibition, alteration or setting aside of any action of the corporation or of its shareholders, directors or officers of or any other party to the proceedings;

(2)    The cancellation or alteration of any provision in the corporation's articles of incorporation or by-laws;

(3)    The removal from office of any director or officer;

(4)    The appointment of any individual as a director or officer;

(5)    An accounting with respect to any matter in dispute;

(6)    The appointment of a custodian to manage the business and affairs of the corporation to serve for the term and under the conditions prescribed by the court;

(7)    The appointment of a provisional director to serve for the term and under the conditions prescribed by the court;

(8)    The submission of the dispute to mediation or other forms of non-binding alternative dispute resolution;

(9)    The payment of dividends;

(10)    The award of damages to any aggrieved party;

(11)    The purchase by the corporation or one or more other shareholders of all, but not less than all, of the shares of the petitioning shareholder for their fair value and on the terms determined under subsection (e); or

(12)    The dissolution of the corporation if the court determines that no remedy specified in subdivisions (1) through (11) or other alternative remedy is sufficient to resolve the matters in dispute.

## COUNT VIII – WASTE
### (Against Drizin, AMT and AmeriMed)

118.    Lazarev incorporates paragraphs 1 through 57 above as if fully stated herein.

119.    At all times pertinent, Drizin has controlled AMT and otherwise usurped total control of AmeriMed.

120.    Lazarev possesses standing to sue Drizin for waste as a shareholder of both Companies.

121.    Lazarev brings this action on behalf of all shareholders of the Companies pursuant to 805 ILCS 5/7.80.

122.    Lazarev has not made a demand on Drizin, AMT or AmeriMed to bring this action for waste because such a demand would be futile.

123.    Demand on Drizin, AMT or AmeriMed to bring this action for waste would be futile because Drizin, the majority shareholder of AMT and purported sole shareholder of AmeriMed, has participated in, assisted in, benefited from, aided, abetted and directed the wrongful acts which have caused the waste of the Companies' assets.

124.    Drizin has wasted and is wasting assets of the Companies by selling the Naples Condo and Garage Space.

125.    Drizin has and is further wasting assets of the Companies by, upon information and belief, investing in poorly performing securities.

126.    Upon information and belief, Drizin has deliberately and recklessly entered into contracts to perform services at negative margins and loss to the Companies for the purpose of attempting to obtain leverage over Lazarev.

127.    Drizin's conduct and omissions while in control of the Companies have and are intended to devalue the current fair market and book value of the Companies as a business in order to prejudice Lazarev's interests in the Companies and obtain leverage over Lazarev relating to the Russian Business.

## COUNT IX –SECTION 8.35(b) OF THE CORPORATION ACT
### (Removal of Drizin as Director of the Companies)

128.    Lazarev incorporates paragraphs 1 through 57 above.

129.    At all times relevant hereto, the Corporation Act was in full force and effect in Illinois.

130.    Section 8.35 of the Corporation Act governs the process for removal of directors of a corporation.  *See* 805 ILCS 5/8.35.

131.    Section 8.35(b) of the Corporation Act specifically provides that a director may be removed from office by order of the circuit court of the county in which the corporation's registered office is located where the court finds that

> (1) the director is engaged in fraudulent or dishonest conduct or has grossly abused his or her position to the detriment of the corporation, and (2) removal is in the best interest of the corporation.

805 ILCS 5/8.35(b).

132.    Drizin has engaged in fraudulent or dishonest conduct and has grossly abused his position as director of the Companies to the detriment of each of AMT and AmeriMed, as well as Lazarev, who is a shareholder of AMT and 99% shareholder of AmeriMed.

CHICAGO/#2965461

133.    As a direct and proximate result of Drizin's fraudulent misconduct and gross abuses power, the Companies have sustained, and continue to sustain, substantial damage.

134.    Accordingly, pursuant to Section 8.35(b), removal of Drizin is warranted.

135.    In addition, removal of Drizin is in the best interests of the Companies.

### COUNT X - SECTION 7.75 OF THE CORPORATION ACT
### (Against AMT and AmeriMed)

136.    Lazarev incorporates paragraphs 1 through 57 above.

137.    At all times relevant hereto, the Corporation Act was in full force and effect in Illinois.

138.    Section 7.75 of the Corporation Act governs examination by shareholders of corporation books and records.  *See* 805 ILCS 5/7.75.

139.    Section 7.75(b) of the Corporation Act provides, in relevant part, as follows:

> Any person who is a shareholder of record shall have the right to examine, in person or by agent, at any reasonable time or times, the corporation's books and records of account, minutes, voting trust agreements filed with the corporation and record of shareholders, and to make extracts therefrom, but only for a proper purpose.  In order to exercise this right, a shareholder must make written demand upon the corporation, stating with particularity the records sought to be examined and the purpose therefor.

805 ILCS 5/7.75(b).

140.    Beginning in November 2016, Lazarev made a written demand upon Drizin, AMT and AmeriMed to examine the corporate books and records of the Companies, stating with particularity the specific records Lazarev sought to examine.

141.    The stated purpose for examining the books and records is proper and not intended for purposes of harassment, oppression or undue burden.

142.    Drizin, AMT and AmeriMed have failed and refused, and continue to refuse, to honor Lazarev's demands to examine the corporate books and records of the Companies.

-29-

143.    Such failure and refusal to honor Lazarev's written demands is wrongful and unjustified.

### COUNT XI – BREACH OF AMT STOCK PURCHASE AGREEMENTS
### (Against AMT)

144.    Lazarev incorporates paragraphs 1 through 57 above.

145.    The AMT Stock Purchase Agreement are enforceable contracts.

146.    Lazarev performed all obligations required of him under the AMT Stock Purchase Agreements and/or all such obligations were otherwise satisfied or waived.  All conditions precedent for this action have also been performed, satisfied or waived.

147.    As detailed above, AMT breached the AMT Stock Purchase Agreements by, among other things, failing to provide Lazarev with stock certificates and failing to recognize Lazarev as a stockholder in AMT.

148.    As a direct, foreseeable and proximate result of AMT's breaches, Lazarev has suffered damages in an amount in excess of $670,000.

### COUNT XII – VIOLATION OF THE CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/2)
### (Against Drizin)

149.    Lazarev incorporates paragraphs 1 through 57 above.

150.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the "CFDBPA") and, specifically, 815 ILCS 505/2 provides as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

151.    Taking advantage of the trust and confidence that Lazarev reposed in Drizin, and acting in his own self-interest and that of AMT, as well as taking advantage of and acting beyond the scope of authority to which he was entrusted by Lazarev, Drizin engaged in the following deceptive acts and practices to the detriment of Lazarev:

(A)    engaging in acts of shareholder oppression including, without limitation, using his position as an officer and the controlling/majority shareholder of the Companies to: (i) deprive Lazarev of the full value of his equity interests in the Companies; (ii) use the Companies' finances to unjustly enrich himself; and (iii) interfere with Lazarev's rights under the AMT Stock Purchase Agreements between AMT and Lazarev, all to the detriment of Lazarev without informing Lazarev, and falsely representing to Lazarev that Lazarev would be the 99% owner in AmeriMed with full control over AmeriMed's assets;

(B)    preparing the AMT Stock Purchase Agreements and other agreements and documents to include terms and provisions that grossly and unfairly favor Drizin and substantially limit Lazarev's ability to (i) run AmeriMed of which he is the majority owner and (ii) obtain rights as a shareholder of AMT, all to the detriment of Lazarev without informing Lazarev, and falsely representing to Lazarev that such terms and provisions are standard and boilerplate;

(C)    falsely representing to Lazarev that Lazarev should purchase stocks in AMT because AmeriMed was not yet incorporated;

(D)    falsely representing to Lazarev that Lazarev cannot own 100% of an American company;

(E)    encouraging Lazarev to deposit the AMT Check into the AmeriMed Account that, unbeknownst to Lazarev (and notwithstanding contra evidence provided to the bank) was owned and controlled by Drizin;

(F)    misappropriating money belonging to Lazarev by incurring expenses and purchasing investments without Lazarev's consent or approval;

(G)    renting the Naples Condo and Garage Space to a third party without Lazarev's consent or approval;

(H)    listing the Naples Condo and Garage Space for sale without Lazarev's consent or approval;

(I)    failing to advise Lazarev that the AMT By-Laws should be amended prior to Lazarev acquiring an interest in AMT (or thereafter);

(J)     preparing incorporating and other operative documents of the Companies to include terms and provisions that grossly and unfairly favor Drizin, and substantially limit Lazarev's ability to run the Companies, including AmeriMed of which he is the majority owner without informing Lazarev of such implications; and

(K)     opening and operating bank accounts of the Companies (including the AmeriMed Account) with full control without informing Lazarev, so that Drizin could convert and steal money belonging to Lazarev by inducing Lazarev to contribute substantial funds to AMT and/or Drizin.

152.    Despite having knowledge to the contrary, Drizin misrepresented to Lazarev—by inducing Lazarev into providing $1,170,000 funds to Drizin—that the management of Lazarev's funds would be controlled by Lazarev, and that there were no improprieties or co-mingling of financial assets by proceeding with the transactions, agreements and funding as detailed above.

153.    Drizin likewise engaged in self-concealing activities and did not disclose that he was surreptitiously incorporating AmeriMed, opening the AmeriMed Account to which he only had access and control, and taking other steps to ensure that Lazarev would have no control over either the Companies.

154.    Similarly, Drizin engaged in self-concealing activities by usurping Lazarev's effective ownership of the Naples Condo and Garage Space and misappropriating hundreds of thousands of dollars Lazarev intended to be invested in assets located in the United States.

155.    At no time was Drizin authorized by Lazarev to take such actions, which actions Drizin took in the conduct of trade or commerce.

156.    Drizin's actions were intended to conceal the foregoing improprieties and calculated to deceive Lazarev.

157.    Lazarev trusted and relied upon Drizin's representations.

158.     Lazarev reasonably and justifiably relied upon Drizin to advise him regarding the terms and conditions of all agreements and undertakings to be performed in order for Lazarev to invest $1,170,000 of funds in the United States for the purposes described herein.

159.     Drizin concealed from and failed to explain or advise Lazarev that the provisions in the above-mentioned agreements gave considerable control and economic advantage to Drizin disproportionate to his own ownership interests, to the detriment of Lazarev as the majority owner of AmeriMed and owner of AMT.

160.     Drizin's actions were intended to fraudulently conceal these and other improprieties and calculated to deceive Lazarev despite the fact that Drizin was obligated to protect the interests of Lazarev without self-dealing, conflicts of interest, or taking any action to the detriment of Lazarev.

161.     Drizin had a personal financial motive and incentive to engage in the foregoing fraudulent conduct, which conduct has proximately caused Lazarev to suffer substantial harm, including but not limited to:

(A)     Depletion and loss of Lazarev's finances and capital;

(B)     Loss of profit distributions to which Lazarev is entitled; and

(C)     Loss of control and imposition of grossly unfair terms and provisions that inhibit Lazarev's ability, as majority owner, to control and operate AmeriMed.

162.     Lazarev has suffered damages and will likely continue to suffer damages as a result of Drizin's unlawful activities.

163.     It is difficult at this time, without an accounting, to ascertain the amount of proceeds that Drizin has defrauded from Lazarev and, therefore, to ascertain the exact amount of damages suffered by Lazarev.

-33-

164.    Lazarev is entitled to costs, damages and attorney's fees as Drizin's conduct is willful under 815 ILCS § 505/10a.

165.    Drizin's deceptive conduct was knowing, intentional and of such an aggravated character as to warrant imposition of punitive damages against Drizin.

**COUNT XIII – PROMISSORY ESTOPPEL**
**(Against Drizin)**

166.    In the alternative, Lazarev incorporates paragraphs 1 through 57 above.

167.    As described more fully above, Drizin made unambiguous promises and assurances to Lazarev regarding the purposes for which Lazarev's $1,170,000 in personal funds would be used, and that Lazarev would have full control of all assets owned by AmeriMed and shareholder rights in AMT. Drizin also made unambiguous promises and assurances regarding the true ownership of the 2016 AMT Investment, the Naples Condo, the Garage Space and the Toyota Camry.

168.    In reliance on Drizin's unambiguous promises and assurances to his detriment, Lazarev agreed to provide Drizin and AMT with $1,170,000 in personal funds.

169.    Lazarev's reliance on these unambiguous promises and assurances were reasonable and foreseeable.

170.    Lazarev has suffered injury as a result of his reliance on Drizin's unambiguous promises and assurances, including but not limited to, the loss of control over $1,170,000 in personal funds, the loss of control of the Naples Condo, the Garage Space and the Toyota Camry, lost profits, consequential damages and other opportunity costs stemming from the approximate $1,170,000 in ill-gotten funds retained by Drizin, as well as attorneys' fees.

CHICAGO/#2965461

171.  Justice requires that Lazarev be compensated for these injuries and damages, which Lazarev would not have incurred had he not justifiably relied on Drizin's unambiguous promises and assurances.

### COUNT XIV – UNJUST ENRICHMENT
### (Against Drizin, AMT and AmeriMed)

172.  In the alternative, Lazarev incorporates paragraphs 1 through 57 above.

173.  In anticipation and exchange for the use and control of assets purchased with his funds, Drizin asked Lazarev to provide Drizin, AMT and/or AmeriMed with $1,170,000 to fund various investments in the United States.

174.  Lazarev actually paid $1,170,000 in personal funds to Drizin, AMT and/or AmeriMed as requested.

175.  To date, Drizin, AMT and/or AmeriMed have failed to return the $1,170,000 to Lazarev, the value of which is at least $1,170,000.

176.  To Lazarev's detriment, Drizin, AMT and/or AmeriMed have voluntarily and unjustly accepted the benefit of the $1,170,000 provided to them by Lazarev, and the retention of this benefit without repayment to Lazarev would violate fundamental principles of justice, equity, and good conscience.

177.  As a direct, foreseeable and proximate result of the foregoing, Lazarev has suffered damages in excess of $1,170,000.

### RELIEF REQUESTED

WHEREFORE, Lazarev respectfully requests that this Court enter Declaratory Judgment or Judgment in favor of Lazarev and against Drizin, AMT and AmeriMed as follows:

A.  On Count I, a declaratory judgment that: (i) Lazarev is the 99% shareholder of AmeriMed; and (ii) Drizin's purported "sole" ownership of AmeriMed is unenforceable because such was procured out of fraud and breaches of fiduciary duties perpetrated by Drizin;

-35-

B. On Count II, a declaratory judgment that: (i) Lazarev is a shareholder of AMT and; (ii) Drizin's refusal to acknowledge Lazarev's ownership of AMT is unenforceable because such was procured out of fraud and breaches of fiduciary duties perpetrated by Drizin;

C. On Counts III, IV, V and VI, a judgement against Drizin and for: (i) the establishment of a constructive trust on the $1,170,000, or any portion thereof, held by him be imposed in favor of Lazarev and that such funds so held by him be immediately turned over to Lazarev plus interest from and after August 7, 2014; (ii) compensatory damages suffered by Lazarev; (iii) punitive damages; and (iv) an accounting as to all Defendants;

D. On Counts VII, XIII, IX and X, a judgment against the Defendants and for: (i) an accounting; (ii) the removal of Drizin as an officer and director of the Companies; (iii) the cancelation or altering of the articles of incorporation and by-laws of the Companies; (iv) the appointment of a custodian to manage the business and affairs of the Companies; and (v) the assessment of a penalty against the Defendants in an amount equal to ten percent (10%) of the value of the shares of the Companies owned by Lazarev;

E. On Count XI, a judgment against AMT and for Lazarev, entitling Lazarev to compensatory damages as a result of AMT's breach of the AMT Stock Purchase Agreements;

F. On Count XII, a judgment against Drizin for his violation of the CFDBPA, plus compensatory damages suffered by Lazarev, as well as punitive damages and reasonable attorneys' fees;

G. On Counts XIII and XIV, a judgment against Drizin and for Lazarev, entitling Lazarev to the return of $1,170,000, plus interest from and after August 7, 2014;

H. An award of reasonable attorneys' fees and costs; and

I. Such other relief, legal or equitable, that this Court deems warranted under the circumstances.

CHICAGO/#2965461

Dated April 7, 2017

Respectfully submitted,

DMITRY LAZAREV

By:  /s/ Brian W. Ledebuhr
              One of His Attorneys

William W. Thorsness
Brian W. Ledebuhr
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
(312) 609-7500
wthorsness@vedderprice.com
bledebuhr@vedderprice.com